2023 IL App (1st) 220443-U

No. 1-22-0443

Order filed June 16, 2023

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE CITY OF CHICAGO, a Municipal Corporation, | ) ) ) | Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 17 M1 401501 |
| JEWELLERY TOWER, LLC, MRR 55 WASHINGTON OWNER, LLC, | ) ) ) | |
| | ) ) | Honorable Patrice Ball Reed, |
| Defendants, | ) ) | Judge Presiding. |
| (MRR 55 Washington Owner LLC, Defendant-Appellee; Jewellery Tower, LLC, Defendant-Appellant). | ) ) ) | |

JUSTICE NAVARRO delivered the judgment of the court.
Justices Mitchell and Lyle concurred in the judgment.

¶ 1    *Held:* The circuit court did not abuse its discretion when it ordered defendant-appellant to take certain actions with respect to the subject property. The circuit court did not abuse its discretion when it found defendant-appellant in indirect civil contempt for failing to comply with the court's order that required it to take the actions; affirmed.

**ORDER**

¶ 2    Defendant-Appellant, Jewellery Tower, LLC, appeals from the circuit court's

interlocutory order that found it in indirect civil contempt for failing to comply with the court's

order that required it to take certain actions to bring a building owned by both Jewellery Tower and Defendant-Appellee MRR 55 Washington into compliance with the City of Chicago's Municipal Code. Jewellery Tower also appeals from the circuit court's underlying order that required it to take the actions. On appeal, Jewellery Tower contends that the court erred when it entered the underlying order that required Jewellery Tower to take certain actions with respect to the building because the court did not conduct an evidentiary hearing and failed to require proof of the elements for injunctive relief. Jewellery Tower also contends that the circuit court abused its discretion when it found it in indirect civil contempt for failing to comply with the court's order.

¶ 3                                         I. BACKGROUND

¶ 4        Initially, we note that this court recently issued an order affirming the circuit court's order that found Jewellery Tower in indirect civil contempt for failing to follow the court's order that required it to sign a façade contract with respect to the subject building. *City of Chicago v. Jewellery Tower, LLC*, 2023 IL App (1st) 220236-U. We will repeat from that order only the facts necessary for an understanding of this case.

¶ 5        This action involves a 38-story high rise building located at 55 East Washington Street in Chicago (Building). MRR owns floors 13-21, which consists of residential property, and Jewellery Tower owns floors 1-12 and 22-38, which consists of retail/office property. In 2017, the City of Chicago (City) filed a complaint against the owners of the Building for building code violations, alleging that the Building failed to comply with the minimum standards of the City of Chicago Municipal Code (Code). In May 2018, the City filed a first amended complaint, alleging that the Building failed to comply with the Code in a number of ways relating to both the interior and exterior parts of the Building, including that defendants failed to

2

"maintain building or structure in a structurally safe and stable condition." The City sought civil penalties and injunctive relief, including, among other things, a temporary or permanent injunction requiring the defendant-owners to correct the violations.

¶ 6                                    Proceedings Until July 2021

¶ 7        In April 2019, the City filed an emergency motion to vacate or appoint a receiver, in which it stated that the Building posed a health and safety problem to the residents and should be immediately vacated and secured. The City stated that on April 2, 2019, an inspection from the Department of Buildings "found multiple building code violations, a number of which are considered dangerous and hazardous," including an incomplete fire suppression system that had not been maintained. The City requested the court order the tenants to vacate the Building and the defendants to remove the unhealthy and unsafe conditions. The City requested, in the alternative, the court appoint a general receiver.

¶ 8        On December 12, 2019, the City filed an emergency petition for appointment of a limited receiver to "[p]repare a feasibility study regarding the care, management, and repair" of the Building, fully fund the construction escrow account, pay utility and scaffolding bills, and cooperate with MRR to fix the Building. On January 23, 2020, the court appointed Jones Receiverships, LLC, as a general receiver for Jewellery Tower's portion of the Building. The order stated that there were "numerous unhealthy and unsafe building conditions, including conditions that pose an imminent threat of irreparable harm and injury to health, safety, and welfare of the public and occupants" of the Building.

¶ 9        On March 5, 2020, the court entered a supplemental order to its order appointing a receiver, in which it concluded:

3

"There exists dangerous and hazardous conditions at the Property that jeopardize the health and safety of the public citizens of the City of Chicago due to cracked and broken windows throughout the upper floors of the building, that could fall, strike and impale pedestrians; and leaking water pipes due to improper heating and lack of insulation."

The Court also stated that the Building "fails to meet the minimum standards of health and safety required by the Municipal Code."

¶ 10 On January 29, 2021, the City conducted an inspection of the Building and subsequently filed its inspection report with the court. The report stated, among other things, that floors 1 and 13-21 were occupied and floors 1-38 did not have "fire ratings between occupied spaces and other vacant spaces," which posed "a dangerous and hazardous conditions to inhabitants of this building." It stated that due to the "condition of the building construction status, and lack of fire rating," the Building should be vacated as soon as possible and that it threatened the "life safety of the inhabitants and the public at the general vicinity at the exterior as well."

¶ 11 The record contains a letter dated February 18, 2021, sent from the City and addressed to the receiver, which stated that the Chicago Fire Department (CFD) was concerned with the ongoing occupancy of the Building due to the current conditions and listed 10 conditions that the parties needed to immediately address, including the elevators; the lack of vertical and horizontal fire separations throughout the Building; the holes in the floors, walls, and ceilings in the vacant areas; pipes that emerge from the floor; and lack of buffer floors between the occupied and vacant areas of the Building. The City stated it was also concerned about the exterior façade, the fire escape, and the ongoing construction in the occupied Building, and that "absent a clear plan and cooperation by all parties a vacate is the best course of action."

4

¶ 12      On April 28, 2021, MRR filed a motion to compel the receiver or Jewellery Tower to reimburse for fire panel costs and to complete other repairs. MRR stated that the parties had numerous meetings about the February 18, 2021, letter. MRR requested the court order the receiver or Jewellery Tower to, among other things, fix elevator car 14, repair the fire escapes attached to the façade, and, in Jewellery Tower's portion of the Building, create the requisite horizontal and vertical fire separation, repair the holes in the walls and floors, and fireproof the buffer floors 8-9 and 22-23. On June 17, 2021, the circuit court issued an order that continued MRR's motion to compel to July 1, 2021.

¶ 13      On May 10, 2021, the circuit court entered an order that stated that Jewellery Tower's principal "now has the capability of presenting a plan to bring the property into compliance"[1] and it ordered Jewellery Tower to present a plan for compliance in 14 days.

¶ 14      On June 16, 2021, Jewellery Tower filed its initial compliance plan, in which it stated that the court had previously determined that it was capable of bringing the Building into compliance with the Code. Jewellery Tower stated that that Building required "significant compliance work" and its immediate concern related to the repairs identified in the January 29, 2021, inspection report. Jewellery Tower stated that the receiver denied Jewellery Tower's contractors the ability to take photographs of the project sites to adequately document the necessary repairs and, therefore, they were unable to submit proposals to Jewellery Tower. It requested the court grant it unfettered access to the Building so it could coordinate with the vendors who were necessary to bring the Building into compliance. Jewellery Tower stated that if it had authority to regain control of the Building and hire its own vendors to perform the work,

---

[1] The record contains another order dated May 10, 2021, which was not stamped by the trial judge, that states that, Jewellery Tower's principal, "now has the capability of bringing the property into compliance."

it would begin by resolving the dangerous and hazardous conditions listed in the inspection report. It stated that it is "ready, willing and able to resume control" of the Building.

¶ 15                                    Hearing on July 1, 2021

¶ 16        On July 1, 2021, the circuit court held a hearing on MRR's motion to compel. At the hearing, Firefighter Robert Steffens provided an update to the court about certain conditions of the Building. Steffens informed the court that elevator 14 was out of service, which "hampers our ability to combat fire in the premises," as this was the only elevator that serviced all floors. He stated that "nothing really has been accomplished" with the buffer floors. Steffens explained that it was a "huge risk having the occupied floors in the building without having these buffer floors as a protective measure for the tenants that are living in the, basically center of the building," as it "hampers their evacuation routes and also will allow fast spread of fire that could actually affect these floors." Steffens told the court that the lack of fire separations "complicates a fire scenario," as a fire could spread to multiple locations. He told the court that there were electrical pipes "coming through the floors and from the ceilings," which could cause entrapment and the firefighters' gear to get "entangled in these pipes."

¶ 17        Following Steffens' update to the court, Jewellery Tower's counsel told the court that it had "filed at least two motions specifically seeking the authority to conduct these repairs," which included repairs to the elevator, buffer floors, the vertical and horizonal fire separation, and the exposed piping. Jewellery Tower's counsel stated that, "we are not disputing that the works needs to be done" and "it's clear these are dangerous and hazardous conditions that fall under the broad purview of this Court." Jewellery Tower's counsel also stated that the court mandated the receiver to take steps to abate the dangerous and hazardous conditions, that "for whatever reason, they are not done," and Jewellery Tower was "happy to begin to take over the

repairs if we are afforded the opportunity to do so." Jewellery Tower's counsel also stated that, in the alternative, it "would join in MRR's motion to compel the receiver to do the same as they no doubt constitute dangerous and hazardous conditions that need to be abated as soon as possible." Jewellery Tower's counsel stated that it was "willing to work with [MRR] to complete these repairs" and "[i]t does not even require a motion to compel as Jewellery Tower is volunteering to undertake this work."

¶ 18    Following the hearing, the court stated that Jewellery Tower "indicated they are willing to make these repairs" and that Jewellery Tower had agreed to do repair work on elevator 14, the fire separation, and the buffer floors. On the same day, the court issued a written order, which granted in part MRR's motion to compel the receiver and/or Jewellery Tower, and ordered Jewellery Tower to,

> "perform the work identified in the [m]otion to compel: 1) repair elevator #14; 2) create the buffer floors above and below the occupied section of the building with complete fire separation and corridors; 3) complete the vertical and horizontal fire separation."

¶ 19            Receiver Discharged and Proceedings Until September 2021

¶ 20    On August 3, 2021, Jewellery Tower filed a supplement to its initial compliance plan, in which it provided an update on the status of the "Initials Repairs" identified in the July 1, 2021, order, including the fire separation, buffer work, and elevator 14. Jewellery Tower stated that on July 16, 2021, its licensed contractors conducted a walkthrough of floors 6-9 and 22-23. Jewellery Tower attached proposals from two contractors for the work on floors 6-9 and 22-23, stating that one proposal had a "timeline of 'TBD' in light of the ongoing Covid-19 pandemic and delays related to the availability of materials." Jewellery Tower concluded that it was

prepared "logistically and financially" to complete these repairs within the next 45 days. It stated that it "will continue to rely on the current receiver, while he remains the acting receiver, to allow Jewellery Tower's contractors and agents access to the Pittsfield Building as necessary to complete the Initial Repairs."

¶ 21    The next day, on August 4, 2021, the circuit court tentatively approved Jewellery Tower's plan for compliance. In the same order, the circuit court discharged the receiver effective August 20, 2021. The order stated that "[u]ntil August 20, 2021, the receiver shall continue to maintain the property and the receivership" and "[u]pon discharge, no new receiver will be appointed and Jewellery Tower, LLC shall be fully responsible for the management of the property."

¶ 22    On August 25, 2021, Jewellery Tower filed a motion to enforce the August 4, 2021, order, arguing that the receiver failed to comply with the August 4, 2021, order because it refused to turn over control of the Building to Jewellery Tower. It stated that the circuit court had "repeatedly determined that Jewellery Tower is capable of bringing the premises into compliance" with the Municipal Code and was financially able to cover the day-to-day operational costs of the Building. It stated that Jewellery Tower was currently "performing certain urgent fire safety repairs" to the Building that were identified by the City on February 18, 2021 "but altogether neglected" by the receiver.

¶ 23              MRR Motion to Compel - September 2021

¶ 24    On September 17, 2021, MRR filed a combined emergency motion to compel Jewellery Tower to immediately pay the gas bill to avoid shut off, petition for rule to show cause and a motion to sell the Jewellery Tower retail/office property. MRR contended that Jewellery Tower failed to pay the gas bill and owed substantial amounts to other critical safety service

8

providers relating to fire monitoring (Siemens) and pedestrian safety scaffolding (Contractors Access Equipment). MRR also stated that Jewellery Tower failed to provide evidence of compliance with the court's July 1, 2021, order that ordered Jewellery Tower to perform work on elevator 14, create buffer floors, and complete the vertical and horizonal fire separation.

¶ 25      On September 21, 2021, the court issued a written order that ordered Jewellery Tower to pay the gas bill to avoid gas disconnect, pay its portion of all unpaid invoices to Siemens and Contractors Access Equipment within two weeks, and to file a response as to why it should not be held in contempt of court.

¶ 26      In Jewellery Tower's response to the petition for rule to show case, it argued that MRR did not have standing to file the petition because the alleged failure to complete repairs did not involve MRR's portion of the Building, as Jewellery Tower owned elevator 14 and floors 7-9. Jewellery Tower also argued that it did not refuse to complete the repairs identified in the July 1, 2021, order. It asserted that the court never required Jewellery Tower to provide evidence of compliance or status updates and MRR did not provide any evidence that Jewellery Tower willfully refused to complete the repairs. It stated that it had "consistently advised the Court of the extreme hurdles it has had to overcome—and continues to overcome—to resolve the litany of issues caused by the former receiver's negligence in maintaining the building." As for the gas bill, it stated that it immediately submitted the gas bill payments and during its review, it discovered that the receiver did not submit any payments to the gas company for over one year.

¶ 27                    Hearing and Order on October 26, 2021

¶ 28      At the hearing on October 26, 2021, Jewellery Tower's counsel told the court that it had "more or less unfettered access" to the Building, "the building transition is occurring," and it is not complete "but we are in a good place." Jewellery Tower's counsel informed the court that

elevator 14 needed "some maintenance" to minor parts and it "sounds like it may be a three-week, three to four-week job between starting, labor, materials and final inspection." The court then asked Jewellery Tower's counsel, "[w]hat about the 16th?" and then explained, "[i]f you are meeting some problem[s] in terms of liens or vendors or at least making communication with the city about some issues, you have to let me know. I won't know otherwise." Jewellery Tower's counsel told the court that, "I just quoted a three to four-week project. That is less than three weeks. I just want to make sure that we were aware of that." The court responded that November 16, 2021, was three weeks, after which counsel stated, "[w]e will do our best, Judge. I don't know what else to say."

¶ 29     As for the work on the buffer floors, Jewellery Tower's counsel informed the court that the architectural drawings for the permit application could take three to four weeks. Counsel stated that the permit would be subject to the City's review and "[o]f course I think everyone in that department is keen to the Pittsfield Building so I don't anticipate there would be too much delay in that submission." The court asked Jewellery Tower's counsel, "[s]o what's going to happen with your architect, are they going to have plans in hand?" Jewellery Tower's counsel responded,

> "at this point I would just be speculating. It seems like—I know this a difficult time for contractors to commit to labor and materials. But I would say again in the three to four-week range. I know I said that we got three weeks. So I would say maybe five to six weeks."

The City's counsel then proposed November 16, 2021, as the date by which Jewellery Tower submit a completed application, stating that submitting the permit application was "not a supply chain issue" but "an architect issue." Jewellery Tower's counsel then responded, "I mean again I

10

would ask for just one more week here. I know these deadlines are firm deadline[s]. And we are three weeks to the day. That is like the very earliest within my window that I—." The court then stated it would give Jewellery Tower until November 23, 2021, and Jewellery Tower's counsel responded, "[v]ery good." As for the fire separation work, Jewellery Tower's counsel told the court that the fire separation plan was included as part of the permit application. The court asked Jewellery Tower's counsel if it would be "doable" to get an update by December 7, 2021, with regard to vendors being hired and start dates, and counsel responded, "I believe so, Judge, yes. That would give you, you know, two-week lag time in between the submission of the permit."

¶ 30    As for the canopy inspection, Jewellery Tower's counsel told the court that Jewellery Tower was "going to hire either someone from the scaffolding company or the independent third-party inspector to make sure that the scaffolding is solid and structurally sound over the coming months." Counsel told the court that "the immediate concern" is the "scaffolding remain structurally sound," that "we are going to start with an inspection to make sure that the scaffolding is in place and is structurally sound," and that "the plan is to make sure that we will survive the winter," after which it will "sit down with the City of Chicago to figure out a timeline for these final repairs." Following a discussion about scheduling, Jewellery Tower's counsel proposed November 18, 2021, as the date by which the parties meet, and Jewellery Tower complete the canopy inspection. The court responded, "[t]hat sounds like a good plan. So there is going to be a meeting next week and then one on the 18th for the façade inspection."

¶ 31    As for the report on the boilers, Jewellery Tower's counsel proposed November 18, 2021, as the date by which Jewellery Tower would provide a report on the condition of the boilers, stating "[w]hy don't we have it by the date that we schedule that meeting on the façade report" and "[t]hat way we can use that as an opportunity to discuss why it's not up and

11

running." As for the outstanding invoices to Siemens and Contractors Access, the court asked counsel, "[s]o specific amount for these two bills that can be paid in the next few days?" Jewellery Tower's counsel responded that, "[w]e can put [*sic*] by Friday [October 29, 2021] if you would like, your Honor."

¶ 32    During the hearing, Jewellery Tower's counsel told the court that, "there certainly has been no willful disobedience," and "[w]e asked to do this work." Counsel emphasized, "[w]e don't need to face petitions for rule to show cause here, motions to compel. We are happy to do this work. We have been trying to get authority for the past year and a half or so just for the authority to be able to do some repairs."

¶ 33    Following the hearing, the court entered a written order, which denied MRR's petition for rule to show cause and noted that "there were not dates for [Jewellery Tower] to take specific actions in the July 1, 2021, order." As for the repair items identified in the July 1, 2021, order, the court concluded as follows:

> "The court now sets the following deadlines for [Jewellery Tower] to take the actions delineated in the July 1, 2021 Order: a. [Jewellery Tower] shall bring Elevator 14 into compliance by November 16, 2021. b. [Jewellery Tower] shall submit a permit application by November 23, 2021, that covers the work on the buffer floors of 6-9 and 21-22 for horizontal and vertical fire separation and corridor construction."

The court also ordered Jewellery Tower to provide a report to the City and MRR regarding the "status of the boilers from the licensed boiler company" and the "condition of existing exterior canopy" by November 18, 2021. The court ordered Jewellery Tower to pay the outstanding invoices to Siemens and Contractors Access Equipment by October 29, 2021.

¶ 34        MRR's Petition for Rule to Show Cause - November 2021

¶ 35    On November 24, 2021, MRR filed a petition for rule to show cause, arguing that Jewellery Tower failed to provide proof of compliance with the items ordered in the October 26, 2021, order. On December 14, 2021, the court issued a written order that continued MRR's petition for rule to show cause and ordered Jewellery Tower to respond to the petition. Thereafter, the court continued MRR's petition several times and then ordered Jewellery Tower to file a response by January 25, 2022.

¶ 36    On January 25, 2022, Jewellery Tower filed a written response to MRR's petition for rule to show cause, arguing that it did not refuse "to complete the repairs identified in Court Order of July 1, 2021," and that MRR did not have standing "to object to or inquire about portions" of the Building it did not own. Jewellery Tower also argued that it had submitted a permit application to begin certain demolition, plumbing, and electrical construction, and that its contractors were ready to begin construction as soon as the City approved the permit application. It stated that it intended to complete construction on the items identified in the July 1, 2021, order as "soon as is practicable."

¶ 37                    January 25, 2022, Hearing

¶ 38    At the January 25, 2022, hearing, Inspector Hector Sobrevilla stated that at the inspection on January 7, 2022, elevator 14 was not working, "the big items obviously weren't done," and there were broken windows and pipes sticking out of the ground on certain floors. Sobrevilla stated that there was no work in progress on the buffer floors or fire separation and there was minor progress on the pipes that were sticking out of the vacant spaces. The parties were given the opportunity to ask Inspector Sobrevilla questions. Later during the hearing, Inspector Steffens discussed elevator 14 and the parties were given the opportunity to ask him questions.

13

¶ 39     Jewellery Tower's counsel told the court that the boiler issue was resolved but agreed that Jewellery Tower did not provide proof of it. The City's counsel told the court that the City was concerned about the condition of the canopy and that Jewellery Tower did not inspect it as ordered. The court informed Jewellery Tower's counsel that it needed to have an inspection of the canopy within the next week. Jewellery Tower's counsel also informed the court that there were outstanding balances owed to Siemens and Contractors Access.

¶ 40     The parties discussed the reasons the repair to elevator 14 was delayed, after which the court stated, "[i]t doesn't make sense to delay this long. It's one issue or another. And that's the problem with this case all long [*sic*] is that Mr. Gong's conduct has caused us to have delays in getting things repairs [*sic*]." The court also stated that,

> "It seems to be a quick fix but for some reason he has to have an alternative or he has to come up with some other idea. And enough is enough. He's got to comply and get this building repaired. He claims he has the funds. He needs to expend those funds and get the work done."

As for the permit application for the fire separation and buffer work, Jewellery Tower's counsel stated that it submitted the permit application and was working on revising the application based on the City's comments. The City's counsel told the court that Jewellery Tower sent him the permit application on January 4, 2022, and that, "I told him what needed to be done and [it] actually has not been submitted. There's not a permit number, application number. There's no details. There's a printout and that's all he has." MRR's counsel noted the application was not signed and only 22 out of the 75 fields were completed. The court concluded that the "work that needs to get done hasn't been done" and "this is dragging out to long."

¶ 41　　Following the hearing, the court issued a written order, in which it granted MRR's petition for rule to show cause, stating that the "[r]ule shall issue why [Jewellery Tower] should not be held in contempt for its failure to comply" with the October 26, 2021, order, and that the rule to show cause was returnable on February 24, 2022. The court ordered Jewellery Tower to provide reports to the City and MRR on the condition of the boiler and the canopy. It ordered Jewellery Tower to submit the permit application for the work on the buffer floors 6-9 and 21-22 and the horizonal and vertical separation construction by February 1, 2022. The court also ordered Jewellery Tower to provide proof of payment of the Siemens and Contractors Access Equipment invoices by February 1, 2022. The court granted MRR's motion to repair elevator 14 and continued MRR's motion to undertake the fire separation work on floor 22, giving MRR to February 1, 2022, to submit a bid for the work.

¶ 42　　　　Jewellery Tower's Status Report and February 25, 2022, Hearing

¶ 43　　On February 24, 2022, Jewellery Tower filed a status of pending matters relating to the Building. It stated that it attached the "most recent, finalized" permit application for the fire separation and buffer floors and that it had retained an engineering firm to complete architectural drawings in connection with the construction. Attached to the status report is a document entitled "Easy Permit Application," which is not signed. The status report stated that Jewellery Tower paid Contractors Access $73,764.92 to ensure services related to the scaffolding continued, which was the minimum account balance due "following the receiver's failure to submit a single payment" for over one year. It stated that Contractors Access had resumed regularly scheduled inspections, one of which occurred in the past week, and it would provide a comprehensive report on the scaffolding "as soon as it becomes available." Jewellery Tower stated that it

retained RMC and Gerkhe Water Treatment to perform various maintenance and repairs to the boiler system, and it attached proposals outlining the scope of their work.

¶ 44                                   Hearing on February 25, 2022

¶ 45        At a hearing on February 25, 2022, MRR informed the court that elevator 14 was operational, and Jewellery Tower's counsel told the court that it submitted the required payments to Siemens and Contractors Access. Jewellery Tower's counsel stated that it had provided a report on the boiler.

¶ 46        Jewellery Tower's counsel told the court that Jewellery Tower did not have a canopy report, explaining that Contractors Access could not complete the report because they were owed about $73,000 at a minimum, which Jewellery Tower paid, and Contractors Access committed to coming back to the property as soon as possible. Counsel stated that Contractors Access knew that the report needed to be submitted as soon as possible and it could not complete the inspection due to the weather, noting that Contractors Access "kept pushing back on account of weather" and they had been at the Building the previous day before it started snowing.

¶ 47        As for the permit application, Jewellery Tower's counsel told the court that Jewellery Tower had submitted a first permit application, which was deemed deficient by the City, after which they incorporated the feedback, and then submitted another application that "should have checked all of the boxes." The City told the court that the submitted application was a "shell." The court told the parties that, "the whole point is that an application needs to be submitted that can be granted and issued. If you're just putting forth a piece of paper that doesn't cover anything, that doesn't accomplish anything, then that's not complying with the order."

¶ 48        During the hearing, Jewellery Tower's counsel argued that it had complied with what it was required to do, stating that the permit application was submitted, "there was information

16

on the boiler," there was a status update with Contractors Access, and there were pictures of some work in progress. In response, the court stated, "an update doesn't tell me that the work has been done" and "the work needs to get done." It stated that the Building is in "dire straits" and "every time you come back to court there's a report but there's no work done and that's the problem I'm having." The court orally found Jewellery Tower in contempt of court, concluding that it had not provided "sufficient information to qualify as compliance" and ordered a fine of $500 per day for failure to comply. The court stated that, "[i]t is willful disobedience if you haven't done it by the compliance date or required date" and that Jewellery Tower failed to comply when it was required to do so.

¶ 49     On March 30, 2022, the court issued a written order on the February 25, 2022, hearing, in which it stated that it found that Jewellery Tower willfully failed to comply with the October 26, 2021, order. It ordered a daily fine of $500 per day until Jewellery Tower fully complied with the requirements of the order.

¶ 50     Under Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016), Jewellery Tower filed an interlocutory appeal of the circuit court's March 30, 2022, order that found Jewellery Tower willfully failed to comply with the court's October 26, 2021.

¶ 51                                    II. ANALYSIS

¶ 52     On appeal, Jewellery Tower contends that the court erred when it entered the October 26, 2021, order because it ordered Jewellery Tower to take specific actions in the October 26, 2021, order without holding an evidentiary hearing and without requiring proof of the required elements for a permanent injunction. Jewellery Tower also contends the court abused its discretion when it found it in indirect civil contempt for failing to comply with the October 26, 2021, order.

¶ 53      As we noted in our prior order, under Rule 304(b)(5), a party may appeal "[a]n

order finding a person or entity in contempt of court which imposes a monetary or other

penalty." Ill. S. Ct. R. 304(b)(5) (eff. Mar. 8, 2016). When we review a contempt order, we must

review the order upon which it is based. *Bryton Properties, LLC v. Kids' Work Chicago, Inc.*,

2022 IL App (1st) 210441, ¶ 25; *In re Marriage of Nettleton*, 348 Ill. App. 3d 961, 968 (2004).

¶ 54      Here, the circuit court's order that found Jewellery Tower in indirect civil contempt is

based on the court's finding that Jewellery Tower failed to comply with the October 26, 2021,

order, in which the court ordered Jewellery Tower to take certain actions related to the Building.

Thus, we must review the October 26, 2021, order, in which the court ordered Jewellery Tower

to take certain actions.

¶ 55                          Underlying October 26, 2021, Order

¶ 56      As discussed in our prior order, we review a circuit court's interlocutory order

granting injunctive relief for abuse of discretion. See *Lumbermen's Mutual Casualty Co. v.*

*Sykes*, 384 Ill. App. 3d 207, 218 (2008) (reviewing the trial court's interlocutory order granting

injunctive relief under the abuse of discretion standard); see *Jewellery Tower, LLC*, 2023 IL App

(1st) 220236-U, ¶ 41. Under this standard, "the actions of the trial court will not be disturbed on

appeal unless they are 'clearly against logic.' " *Pierce v. Cherukuri,* 2022 IL App (1st) 210339, ¶

19 (quoting *Miranda v. The Walsh Group, Ltd.,* 2013 IL App (1st) 122674, ¶ 16). Further, a

circuit court abuses its discretion if the ruling is unreasonable, arbitrary, or no reasonable person

would take the view it adopted. *Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶ 64.

¶ 57      Jewellery Tower contends that the court erred when it entered the October 26, 2021,

order because it ordered Jewellery Tower to take specific actions without holding an evidentiary

hearing and without requiring proof or making findings of the required elements for a permanent

injunction. The elements that a party must establish for a permanent injunction include: (1) there is a clear and ascertainable right in need of protection, (2) the party will suffer irreparable harm if the injunction is not granted, and (3) there is no adequate remedy at all. *In re Marriage of Seffren,* 366 Ill. App. 3d 628, 637 (2006). Jewellery Tower also asserts that the circuit court denied it due process by ordering it to take certain actions without giving it the opportunity to present evidence or cross-examine witnesses. It also asserts its due process rights were violated because at the October 26, 2021, hearing it had notice that it had to present evidence of how it had complied with the July 1, 2021, order, but did not have notice "as to the reasonableness of the then non-existent deadlines to complete such work." It states that the circuit court did not hold a hearing to determine whether the state of the Building even required the injunctive relief that the court ordered.

¶ 58       Here, during the proceedings in the circuit court, Jewellery Tower never raised the arguments that the court erred in entering the October 26, 2021, order because there was no evidentiary hearing, it did not have proper notice, or because MRR did not establish the elements for an injunction. "It is well settled that issues not raised in the trial court are forfeited and may not be raised for the first time on appeal." *Bank of New York Mellon v. Rogers*, 2016 IL App (2d) 150712, ¶ 72.  Thus, Jewellery Tower's arguments are forfeited.

¶ 59       Nevertheless, even if we would find the arguments were not forfeited, we would find that the circuit court did not err in entering the October 26, 2021, order that required Jewellery Tower to take certain actions to address the dangerous and hazardous conditions at the Building.

¶ 60       As previously discussed, the October 26, 2021, order required Jewellery Tower to provide a report on the status of the boilers from a licensed boiler company and a report on the condition of the existing exterior canopy by November 18, 2021. The order also required it to

pay the outstanding invoices to Siemens and Contractors Access Equipment by October 29, 2021, to bring elevator 14 into compliance by November 16, 2021, and to submit a permit application that covered the work on the buffer floors of 6-9 and 21-22 and for horizonal and vertical fire separation and corridor construction by November 23, 2021. Before the court issued the order, Jewellery Tower acknowledged that the conditions at the Building were unsafe and hazardous and that the work to address the dangerous conditions needed to be done.

¶ 61        At the July 1, 2021, hearing, Jewellery Tower's counsel told the court that it "had filed at least two motions specifically seeking the authority to conduct" repairs to the elevator, buffer floors, the fire separation, and the exposed piping. Jewellery Tower's counsel also expressly told the court that, "we are not disputing that the works needs to be done" and "it's clear these are dangerous and hazardous conditions that fall under the broad purview of this Court." Then, at the hearing on October 26, 2021, Jewellery Tower's counsel never objected to the necessity of the required actions to abate the dangerous or hazardous conditions or Jewellery Tower's responsibility to address them. Rather, Jewellery Tower's counsel told the court that,"[w]e asked to do this work." Counsel also stated: "We don't need to face petitions for rule to show cause here, motions to compel. We are happy to do this work. We have been trying to get authority for the past year and a half or so just for the authority to be able to do some repairs."

¶ 62        Further, Jewellery Tower had the opportunity to present argument and evidence at the October 26, 2021, hearing, and it never requested to present any witnesses or evidence. Rather, at the hearing, Jewellery Tower informed the court about the time it would take to complete certain actions and agreed to the dates by which it had to complete the actions. Jewellery Tower's counsel proposed November 18, 2021, as the date by which it would provide a report on the

boiler and stated that it could pay the outstanding invoices by October 29, 2021. Jewellery Tower's counsel told the court it would take about three to four weeks for the repairs for elevator 14, so the court provided November 16, 2021, which was three weeks, as the deadline, after which Jewellery Tower's counsel responded that they had quoted a three-four week project and "[w]e will do our best, Judge. I don't know what else to say."

¶ 63        As for the report on the canopy, although Jewellery Tower's counsel proposed November 18, 2021, as the date by which it had to complete the canopy inspection and not specifically as the date by which it had to submit the canopy report, Jewellery Tower proposed this date as the date the parties would meet on the façade inspection and did not object to also being required to submit the canopy report by this date. Counsel also stressed the urgency of the canopy inspection, as it stated that the "immediate concern" was "that the scaffolding remain structurally sound," that "we are going to start with an inspection to make sure that the scaffolding is in place and is structurally sound," and "the plan is to make sure that we will survive the winter." As for the permit application for the buffer floors and fire separation, Jewellery Tower's counsel informed the court that the "plans we were quoted, again three to four weeks" and also that it could take five to six weeks. Following a discussion regarding the application, the City proposed November 16, 2021, as the date to complete the application, after which Jewellery Tower requested, "just one more week." The court responded that it would give Jewellery Tower to November 23, 2021, and Jewellery Tower's counsel responded, "[v]ery good." Jewellery Tower cannot proceed in a certain manner by offering timeframes and agreeing to dates and to the necessity of the actions and then later argue that the court abused its discretion when it ordered the actions to be completed by these specific dates. See *People v. Harvey*, 211

Ill. 2d 368, 385 (2004) (a party may not request to proceed in one way and then later assert on appeal that the course of action was in error).

¶ 64        In addition, as we discussed in our prior order, Jewellery Tower does not dispute that the Building is dangerous or unsafe, and in March 2020, the circuit court found that the Building was dangerous and unsafe. *Jewellery Tower, LLC*, 2023 IL App (1st) 220236-U, ¶¶ 43, 47. Further, at the July 1, 2021, hearing, Inspector Steffens informed the court about the existing fire safety issues at the Building, explaining that the nonoperational status of elevator 14 "hampers our ability to combat fire in the premises" and there was a "huge risk" having occupied floors without the buffer floors as a protective measure, as it "hampers their evacuation routes and also will allow fast spread of fire that could actually affect these floors." He explained that lack of fire separations "complicates a fire scenario," as a fire could spread to multiple locations, and the electrical pipes "coming through the floors and from the ceilings" could cause entrapment and the firefighters' gear to get entangled in the pipes. As previously discussed, Jewellery Tower's counsel acknowledged the dangerous and hazardous conditions, stating at the July 1, 2021, hearing that, "it's clear there are dangerous and hazardous conditions that fall under the broad purview of this Court."

¶ 65        As we discussed in our prior order, "under section 11-13-15 of the Illinois Municipal Code, municipalities may "enforce zoning and building ordinances in order to promote public health, welfare and safety." *Village of Tinley Park v. Ray,* 299 Ill. App. 3d 177, 179 (1998) (citing 65 ILCS 5/11-13-15 (West 1996)); see *Jewellery Tower, LLC*, 2023 IL App (1st) 220236-U, ¶ 42. And, as we stated in our prior order, under that section of the Illinois Municipal Code, a court "has the power and in its discretion may issue a restraining order, or a preliminary injunction, as well as a permanent injunction, upon such terms and under such conditions as will

do justice and enforce the purposes" of the statute. 65 ILCS 5/11-13-15 (West 2022); see *Jewellery Tower, LLC*, 2023 IL App (1st) 220236-U, ¶ 42.

¶ 66    Accordingly, considering the dangerous and hazardous conditions of the Building and the circumstances here, including that Jewellery Tower agreed to and did not object to the dates and to the necessity of the actions, we cannot find that the court abused its discretion in entering the October 26, 2021, order that required Jewellery Tower to perform certain actions by specific dates. The order was not unreasonable or arbitrary such that no reasonable person would agree with it.

¶ 67                         Indirect Civil Contempt Order

¶ 68    Jewellery Tower contends that the circuit court's ruling that found Jewellery Tower in indirect civil contempt for failing to comply with the October 26, 2021, order is against the manifest weight of the evidence and an abuse of discretion. Jewellery Tower argues that MRR did not have standing to bring the petition for rule to show cause because the October 26, 2021, order addressed elevator 14 and floors 7-9 of the Building[2], which are owned by Jewellery Tower. Jewellery Tower also argues that the underlying October 26, 2021, order is impermissibly impossible to comply with and that the contempt order's purge provision is improper, as it requires the actions of third parties. It also argues that the contempt order is vague and lacks specificity regarding the purge requirements.

¶ 69    "A court has the authority to enforce its orders by way of contempt." *In re Marriage of Levinson*, 2013 IL App (1st) 121696, ¶ 52; see *Jewellery Tower, LLC*, 2023 IL App (1st) 220236-U, ¶ 51. Thus, "a party may be held in civil contempt for willfully failing to comply with a court order." *In re Marriage of Harnack & Fanady*, 2022 IL App (1st) 210143, ¶ 46. "Civil

---

[2] Jewellery Tower states in its brief that the October 26, 2021, order addressed floors 7-9. The October 26, 2021, order states that Jewellery Tower shall submit a permit application for floors 6-9 and 21-22.

contempt proceedings 'are coercive, that is, the civil contempt procedure is designed to compel the contemnor to perform a specific act.' " *Id.* (quoting *In re Marriage of Levinson*, 2013 IL App (1st) 121696, ¶ 52). "Civil contempt proceedings are designed to compel obedience to a court order." *Bank of America, N.A. v. Freed*, 2012 IL App (1st) 113178, ¶ 42. "Once the party bringing the contempt petition establishes a *prima facie* case of disobedience of a court order, the burden shifts to the alleged contemnor to prove that the failure to comply was not willful or contumacious and that there exists a valid excuse for his failure." *In re Marriage of Harnack & Fanady*, 2022 IL App (1st) 210143, ¶ 46.

¶ 70        Further, "[w]hether a party is guilty of contempt is a question of fact to be resolved by the circuit court, and its resolution of the issue will not be disturbed on appeal unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion." *Id;* see *Jewellery Tower, LLC*, 2023 IL App (1st) 220236-U, ¶ 52. " 'A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence.' " *In re Marriage of Knoll & Coyne*, 2016 IL App (1st) 152494, ¶ 50 (quoting *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶ 43).

¶ 71        Applying these principles above, we find that the circuit court's ruling that found Jewellery Tower in indirect civil contempt for failure to comply with the October 26, 2021, order is not against the manifest weight of the evidence. We will first address Jewellery Tower's argument that MRR did not have standing to file the petition for rule to show cause.

¶ 72                MRR's Standing to File the Petition for Rule to Show Cause

¶ 73        Jewellery Tower argues that MRR did not have standing to bring the petition for rule to show cause seeking to have Jewellery Tower held in contempt for failure to comply with the

October 26, 2021, order. Jewellery Tower asserts that MRR did not have standing because the October 26, 2021, order addressed elevator 14 and floors 7-9 of the Building, which are owned by Jewellery Tower and are not common elements.

¶ 74        Section 11-13-15 of the Illinois Municipal Code provides that "any owner or tenant of real property, within 1200 feet in any direction of the property on which the building or structure in question is located who shows that his property or person will be substantially affected by the alleged violation" of the Illinois Municipal Code may institute any appropriate action. 65 ILCS 5/11-13-15 (West 2020).  Here, MRR is substantially affected by the October 26, 2021, order that required Jewellery Tower to take certain actions to address the dangerous and hazardous conditions at the Building. In the City's complaint, the City sought injunctive relief, which included an order authorizing, if necessary, the City to demolish the Building. As a part owner of the Building, MRR is substantially affected by existing code violations and has an interest in the actions needed to address the dangerous and hazardous conditions to avoid an order requiring the Building to be vacated or demolished.

¶ 75        Further, the October 26, 2021, order required Jewellery Tower to submit a permit application for the work on the fire separation and buffer floors 6-9 in Jewellery Tower's portion of the Building, which involves the existing fire safety issues that impact the entire Building. At the July 1, 2021, hearing Inspector Steffens explained that the lack of buffer floors was a "huge risk" because they were a protective measure for tenants living in the center of the Building and the lack of fire separations could cause a fire to spread to multiple locations. Further, as to elevator 14, Inspector Steffens told the court that the elevator serviced all floors and the nonoperational status "hampers our ability to combat fire in the premises."

¶ 76        Jewellery Tower relies on the circuit court's April 22, 2021, order to support its argument that MRR did not have standing to file the petition for rule to show cause for failing to comply with the October 26, 2021, order. It asserts that the court held in the April 22, 2021, order that MRR did not have standing to object to or inquire about "any work that was not completed on the common areas and is not MRR's responsibility." However, the court stated in that order that, "MRR does not have standing to inquire of or object to Spartan Contractor fees for any work done in Phase 1 or 2 that were not completed on the common areas and are not MRR's responsibility." Thus, the circuit court's order addressed MRR's standing to inquire or object to contractors' fees for any work done on the common areas and are not MRR's responsibility, and it did not address MRR's standing related to inquiring of or objecting to the actions ordered to address the dangerous and hazardous conditions that exist in Jewellery Tower's portion of the Building that effect MRR's portion.

¶ 77                                Underlying October 26, 2021, Order

¶ 78        We next address Jewellery Tower's contention that the court abused its discretion when it entered the contempt order because the underlying October 26, 2021, order is impermissibly impossible to comply with. It asserts that the receiver's inaction obstructed its ability to comply with the October 26, 2021, order and that "to no fault of its own," it "was left in a position where it was constructively impossible to meet the arbitrary deadlines set by the court." Jewellery Tower asserts that "given the mess left by the Receiver" and its "struggles to ascertain the status of the repairs," it could not complete the required repairs in the timeframes the court ordered.

¶ 79        We disagree with Jewellery Tower's argument that the court abused its discretion because the October 26, 2021, order is impossible to comply with. As previously discussed, at

26

the October 26, 2021, hearing, Jewellery Tower's counsel offered timeframes for the work and agreed to the dates set forth in the order. Jewellery Tower never represented to the court that the dates by which it had to perform the actions were impossible to comply with. Jewellery Tower cannot now argue on appeal that the dates set forth in the order were impossible to comply with. See *Cholipski v. Bovis Lend Lease, Inc.*, 2014 IL App (1st) 132842, ¶ 63 (Internal citations and quotation marks omitted.) ("a party may not request to proceed in one manner and then later contend on appeal that the course of action was in error.") We also note that the February 25, 2022, hearing in which the court orally found Jewellery Tower in indirect civil contempt for failure to comply with the October 26, 2021, order was about four months after the court had ordered, and Jewellery Tower had agreed to, the dates set forth in that October 26, 2021, order.

¶ 80                          Purge Provision in the Contempt Order

¶ 81        Jewellery Tower argues that the contempt order is vague and lacks specificity regarding the purge requirements. It also argues the contempt order's purge provision is improper because it had to depend on third-party action to comply with the October 26, 2021, order.

¶ 82        "A person held in civil contempt must have the ability to purge the contempt by complying with the court order." *In re Marriage of O'Malley ex rel. Godfrey*, 2016 IL App (1st) 151118, ¶ 26. "A valid contempt order must contain a purge provision, which lifts the sanction when the contemnor complies with the order." *Bank of America, N.A.*, 2012 IL App (1st) 113178, ¶ 42. "A civil contempt order that fails to provide the contemnor with the 'keys to his cell' is void." *Id.*

¶ 83        The contempt order and purge provision are specific and not vague. In the court's March 30, 2022, order, it found Jewellery Tower in indirect civil contempt and imposed a daily

fine "until it fully complies with the requirements of the October 26, 2021 order." The October 26, 2021, order, was clear on what action the court required from Jewellery Tower and, at the February 25, 2022, hearing it was clear on what action Jewellery Tower still needed to complete.

¶ 84    The October 26, 2021, order required Jewellery Tower to provide a report on the status of the boilers from a licensed boiler company, provide a report on the condition of the existing exterior canopy, bring elevator 14 into compliance, submit the outstanding invoices to Siemens and Contractors Access Equipment, and submit a permit application that covered the work on the buffer floors of 6-9 and 21-22 for horizontal and vertical fire separation and corridor construction.

¶ 85    At the February 25, 2022, hearing, it was clear that Jewellery Tower still had not provided a report on the canopy or submitted a complete permit application for the fire separation work and buffer floors. As for the canopy report, Jewellery Tower informed the court that it had provided a "status update" and had not provided a report on the condition of the existing exterior canopy. The court responded that, "an update doesn't tell me that the work has been done" and "the work needs to get done." As for the permit application, although Jewellery Tower informed the court that it had submitted an application, the court orally explained that Jewellery Tower still needed to submit a completed application to comply with the order. The City informed the court that Jewellery Tower's permit application was a "shell of an application that seems to be applying for work done to a roof on a small building," and the court explained to Jewellery Tower's counsel that, "the whole point is that an application needs to be submitted that can be granted and issued," and "[i]f you're just putting forth a piece of paper that doesn't cover anything, that doesn't accomplish anything, then that's not complying with the order." Thus, at the February 25, 2022, hearing, Jewellery Tower knew it had not provided a report on the canopy

and had not submitted a complete permit application for the fire separation and buffer floors as required by the court. Accordingly, the contempt order's purge provision that required Jewellery Tower to comply with the October 26, 2021, order is not vague.

¶ 86　　　Jewellery Tower asserts that the contempt order and purge provision are vague and confusing because the court granted MRR authority to repair elevator 14 and to contract for the buffer work on floor 22. On January 25, 2022, the court granted MRR authority to repair elevator 14, and at the February 25, 2022, hearing, it was clear that MRR had completed the repair and was not one of the actions that Jewellery Tower still needed to complete. As for the fire separation work on floor 22, on February 8, 2022, the court granted MRR authority to hire a contractor for the floor 22 work. However, the October 26, 2021, order required Jewellery Tower to submit a permit application that "covers the work on buffer floors 6-9 and 21-22 horizontal and vertical fire separation and corridor construction." At the February 25, 2022, hearing, it was clear that Jewellery Tower had not submitted a complete permit application as required by the court. Accordingly, the record does not support Jewellery Tower's assertion that the contempt order is vague because the court granted MRR the authority to fix elevator 14 and hire a contractor for floor 22.

¶ 87　　　We also note that Jewellery Tower argues that the contempt order and purge provision are impermissibly vague because the order did not set new deadlines for Jewellery Tower to conduct the required repairs. However, Jewellery Tower has not provided any authority to support that a purge provision is invalid if it does not contain new deadlines.

¶ 88　　　We next address Jewellery Tower's argument that the purge provision is improper because it requires actions from third parties. Courts have found a purge provision invalid when it required action or cooperation from another party in the case or from a third party. See *In re*

*A.M.*, 2020 IL App (4th) 190645, ¶ 32 (finding that a provision requiring the father to participate and cooperate with the mother with respect to scheduling makeup parenting time was not a proper purge provision, noting that the "ability to purge her contempt was not left solely within her control"); *Bank of America N.A.,* 2012 IL App (1st) 113178, ¶¶ 43-44 (where the purge provision required the receiver to report to the court that his investigation was complete and to make a recommendation to the court, the reviewing court found that these provisions took "the keys of the defendants' hands and gave them to the receiver," noting that "the contempt will not be purged until the receiver determines that his investigation is complete and makes a report and recommendation to the court").

¶ 89        Here, in order for Jewellery Tower to comply with the requirements of the October 26, 2021, order, the court did not require action from another party in the case or a third party over whom Jewellery Tower had no control. Rather, to purge the contempt and complete the actions required in the October 26, 2021, order, which included providing a report on the existing exterior canopy and submitting the permit application, Jewellery Tower had to work with parties with whom it could make an agreement with and contract for services. Thus, Jewellery Tower had the control and ability to reach an agreement and contract with these parties regarding when it needed them to complete the work pursuant to the court's order, and it had the ability to communicate any issues to the court. Thus, the purge provision here was not improper because it required actions from third parties.

¶ 90        Accordingly, Jewellery Tower failed to comply with the court's October 26, 2021, order, as it did not submit a complete permit application or provide a report on the condition of the existing exterior canopy, and the record supports the circuit court's finding that Jewellery Tower's failure to comply with the order was willful. We cannot find an opposite conclusion is

clearly apparent or that the court's finding is unreasonable, arbitrary, or not based on the evidence. Thus, the circuit court's finding is not against the manifest weight of the evidence and the court did not abuse its discretion when it found Jewellery Tower in indirect civil contempt for failing to comply with the October 26, 2021, order.

¶ 91                                    III. CONCLUSION

¶ 92        The circuit court did not err in its October 26, 2021, order that required Jewellery Tower to take certain actions related to the Building. The circuit court did not err in its March 30, 2022, order when it found Jewellery Tower in indirect civil contempt for failing to comply with the October 26, 2021, order. We affirm the judgment of the circuit court.

¶ 93        Affirmed.